# ALLEN P. ROBERTS, P.A.
## ATTORNEYS AT LAW

Allen P. Roberts
Camden Office
325 Jefferson St. S.W.
P.O. Box 280
Camden, AR 71701
allen@aprobertslaw.com

Telephone: (870) 836-5310
Facsimile: (870) 836-9662

Whitney F. Moore
Little Rock Office
1818 N. Taylor St., Ste. B
PMB 356
Little Rock, AR 72227
whitney@aprobertslaw.com

June 24, 2016

*VIA EMAIL ONLY*
Ms. Jennifer Davis, Staff Attorney
Arkansas Department of Education
Attn: Arkansas Public School Choice Act Appeals
Four Capitol Mall, Room 301-A
Little Rock, Arkansas 72201
jennifer.davis@arkansas.gov

Re:   El Dorado School District (Resident District)
      Parkers Chapel School District (Non-Resident District)
      Public School Choice Act of 2015 Appeal submitted by the McAuliffe family

Dear Ms. Davis:

Whitney Moore and I represent El Dorado School District (EDSD).

EDSD is the resident district involved in the aforementioned Public School Choice Act of 2015 appeal filed by the McAuliffe family, who applied to transfer their three children to the Parkers Chapel School District (PCSD). PCSD correctly denied the transfer requests based on EDSD's declaration of a conflict pursuant to Ark. Code Ann. 6-18-1906(a). In compliance with Ark. Code Ann. 6-13-113(b) and 6-18-1906(a)(2), EDSD has submitted to the Department of Education a copy of the orders in *Kemp et al. v. Beasley*, No. ED-1048, U.S. Dist. Ct., W.D. Ark., El Dorado Div. and *Townsend, et al. v. EDSD, et al.*, 1:89-CV-1111, U.S. Dist. Ct., W.D. Ark., El Dorado Div, which are desegregation court orders that conflict with EDSD's participation in school choice.

Pursuant to your notice of hearing letter dated June 9, 2016, I would like to submit the following materials for consideration at the State Board of Education's July 14, 2016 meeting:

1. PCSD's May 11, 2016 letter denying the McAuliffes' school choice applications. (**Exhibit 1**).
2. My April 20, 2015 letter regarding EDSD's decision not to participate in school choice, which includes various orders entered in the desegregation cases to which EDSD is a party, including but not limited to the August 2,



EXHIBIT
13

1971 order in *Kemp et al. v. Beasley*, No. ED-1048, U.S. Dist. Ct., W.D. Ark., El Dorado Div. and the May 3, 2013 order in *Townsend, et al. v. EDSD, et al.*, 1:89-CV-1111, U.S. Dist. Ct., W.D. Ark., El Dorado Div. (**Exhibit 2**).

3. Former Attorney General Mike Beebe's September 24, 2003 opinion regarding the State Board of Education's authority to construe court orders (**Exhibit 3**).

4. Attorney General Leslie Rutledge's July 17, 2015 opinion regarding the Department of Education's authority to construe court orders (**Exhibit 4**).

5. The Plaintiffs' Complaint in *Kemp et al. v. Beasley*, No. ED-1048, U.S. Dist. Ct., W.D. Ark., El Dorado Div. (**Exhibit 5**).

6. Testimonial letters from Bob Watson, former EDSD Superintendent, and Dr. Jerry Guess, former superintendent of Camden Fairview School District and current superintendent of Pulaski County Special School District (**Exhibit 6**).

EDSD submits the following arguments as to why the appeal should be denied.

### 1. PCSD's Failure to Serve EDSD with the application is fatal to the appeal

EDSD notes that the McAuliffes' applications were denied by PCSD by letter dated May 11, 2016. (See Exhibit 1). EDSD has not received a copy of the school choice applications as required by 6.01.1 of the ADE's Rules Governing the Public School Choice Act of 2015 (August 2015). The appeal should be denied due to PCSD's failure to comply with the Act and promulgating rules.

### 2. Untimeliness of Filing School Choice Application

Because EDSD never received the applications, as mentioned above, EDSD is unable to verify whether the McAuliffes' applications were timely filed by May 1, 2016. EDSD has requested a copy of the applications from ADE and PCSD but has not received them as of the date of this filing. For that reason, EDSD reserves the right to argue to the State Board that the applications were untimely under the Act and its promulgating rules if the applications were filed after May 1, 2016.

### 3. EDSD Properly Declared a Conflict with the School Choice Act

EDSD declared a conflict with the School Choice Act of 2015 due to its outstanding desegregation obligations. EDSD remains subject to the jurisdiction of the federal court. The Honorable Susan O. Hickey, United States District Court for the Western District of Arkansas, stated in her most recent order (May 3, 2013) that the Court "shall continue to exercise jurisdiction over this matter until it finds that EDSD should be released from Court supervision." (See Exhibit 2, page 4).

The McAuliffes' appeal letter argues that "Decisions should be made on the (sic) all the facts and information that is collected not made based on race." EDSD does not participate in school choice. While the reason for its non-participation is a desegregation

case, the result of the exemption is that no student may transfer to or from EDSD, regardless of their race. The school choice applications of the McAuliffe children would still have been denied based on EDSD's exemption even if they were black, Hispanic, or any other race.

**4.    The Federal Court with Jurisdiction of the Desegregation Case, not the State Board of Education, is the Proper Party to Evaluate EDSD's Declaration of a Conflict**

There is no indication from the 2015 Act (nor from its predecessor, the Public School Choice act of 2013) that the legislature intended for the State Board of Education to review the propriety of a conflict claimed by a district pursuant to Ark. Code Ann. 6-18-1906(a). There is no provision in the Act that authorizes the Department or the State Board to approve or deny a district's submission. The Act only requires the district to claim a conflict and furnish the Department of Education with a copy of the conflicting order, which EDSD has done.

An Attorney General's opinion issued in 2003 regarding the School Choice Act of 1989 directly addresses the question of whether the State Board should review and interpret federal court orders. On September 24, 2003, the Attorney General's office wrote to then ADE director, Ray Simon, in Opinion No. 2003-269. Mr. Simon had asked whether or not the State Board of Education had the legal authority to decide whether a district could accept students outside the parameters of the 1989 Act "as long as the district is in compliance with the requirements of the assumed U.S. District Court Order?" (Exhibit 4, p. 2). Attorney General Beebe makes clear in the opinion that the State Board of Education should not seek to interpret federal court orders, stating:

> In my opinion the state Board of Education does not have authority to determine that a school district 'is in compliance with the Arkansas School Choice Act' where in order to do so, the Board would have to construe the provisions of a federal district court order and make a determination that it supersedes the racial limitations in subsection (f) of the Arkansas Public School Choice Act. This is essentially a judicial decision.

The opinion concludes with the note that disputes involving construction of federal court orders are properly left to the parties themselves, their respective counsels, or if necessary, to the issuing court itself. (Exhibit 3, p. 5).

Attorney General Leslie Rutledge (in Opinion No. 2015-051, attached as Exhibit 4) echoes the previous opinion issued by Attorney General Beebe. Regarding the 2015 Act and whether or not the ADE had an obligation to "make a determination as to the veracity of a school district's claim of a conflict or the adequacy of the 'proof' it has submitted," Attorney General Rutledge opined that "the ADE is neither authorized nor obligated to take the actions contemplated." (Exhibit 4, p. 7). Continuing, she notes that "the law is silent on what, if anything, the ADE is supposed to do with the 'proof' a school district submits. The [Act] does not charge the ADE to undertake to verify a

3

school district's claim of exemption or make a determination as to the sufficiency or truth of the proof submitted." (Exhibit 4, p. 8).

### 5.    EDSD Remains Under the Jurisdiction of the Federal Court

EDSD operated a racially dual system as required by Arkansas law until 1954. When required to desegregate *circa* the early 1960s it did so by adopting a freedom of choice plan. Under this plan the black students could attend the white schools, and the white students could attend the black schools, if they chose. After several years under this plan the black schools remained virtually all black and the white schools all white. In other words, school choice achieved no desegregation.

The *Kemp* case, filed October 15, 1964 while EDSD was operating under freedom of choice, was filed by the black parents of school age children who alleged they were not admitted to attend EDSD due to their race. (Exhibit 5, Kemp Complaint, ¶¶ 2-4). Specifically, the *Kemp* plaintiffs alleged that

[the Defendants], acting under color of the authority vested in them by the laws of the State of Arkansas, have pursued and are presently pursuing a policy, custom, practice and usage of operating the public school system of the El Dorado School District . . . on a basis that discriminates against plaintiffs and other Negroes similarly situated because of race or color . . . ."

(Exhibit 5, ¶ 9).

In 1969, the U.S. Supreme Court said that freedom of choice was unconstitutional. *See Raney v. Board of Ed. of Gould, Ark. School Dist.*, 391 U.S. 443 (1968). Shortly after *Raney*, the federal Department of Health, Education, and Welfare, dispenser of federal education funds, rescinded its approval of freedom of choice desegregation plans. This left EDSD, and virtually all other south and east Arkansas school districts, with only one choice: Merge the black and white students into a single student body. Since then EDSD has operated in this manner under the scrutiny of the successor federal agency (Department of Education, Office of Civil Rights), and the federal district court in *Kemp* and *Townsend*, but with very little intervention from either. The only reason EDSD has not been subject to more scrutiny by the Department of Education, its Office of Civil Rights, and the federal court is because since meaningful desegregation (*circa* 1969) white students have been restricted from residing in the district and attending school in one of the nearby whiter districts.

As noted in my letter attached as Exhibit 2, the desegregation obligations of these cases prohibit EDSD from taking any action, or refraining from taking any action, the natural and probable consequence of which would be a segregative impact within EDSD (i.e., the creation, maintaining, or increasing of racially identifiable schools). Permitting school choice would have such an impact. Allowing school choice would, therefore, be in conflict with EDSD's desegregation obligation still outstanding.

Other noteworthy excerpts of the desegregation orders include:

- The August 2, 1971 order specifically prohibits EDSD from participating in choice in that "All vestiges of 'freedom of choice' is eliminated and **any further use prohibited**." (See Exhibit 2, p. 16, emphasis added). The 2015 School Choice Act is a freedom of choice plan, and as such, EDSD is prohibited by the *Kemp* order from participating.

- In the October 28, 2003 Order, Judge Barnes addressed school assignment issues when he approved EDSD's request to establish a magnet school program. The magnet school program was initiated with the goal of furthering EDSD's desegregation efforts by "reduc[ing] racial isolation and entic[ing] students from surrounding districts and private schools to attend [EDSD]." (See Exhibit 2, p. 9). Judge Barnes's order states that the Court "retains continuing jurisdiction and supervision pursuant to this Court's Order filed August 2, 1971." (Exhibit 2, p. 7).

- In May 2013, Judge Hickey noted that the district would remain under the jurisdiction of the Court "until it finds that EDSD should be released from Court supervision (Exhibit 2, p. 4).

The documents containing testimony from Bob Watson, former EDSD Superintendent, and Dr. Jerry Guess, former superintendent of Camden Fairview School District and current superintendent of Pulaski County Special School District, confirm that the effect of allowing school choice in EDSD would result in the rapid resegregation of Union County. (See Exhibit 6).

There are no orders dismissing the case or declaring that EDSD is unitary.

### 6.   A District's Declaration of a Conflict is Not Appealable

The structure of the Act also strongly suggests that the assertion of a conflict is not appealable because there is no provision in either the Act or the emergency rules that the resident district do anything when the non-resident district denies the application. This logically should mean that appeals are limited to issues such as enrollment caps and capacity issues. The applications were denied solely due to EDSD's conflict, not due to capacity or enrollment caps.

The Act lacks any provision for the resident district to be heard as a party on appeal. If an appeal of the asserted conflict was contemplated, then party status would have been accorded the resident district. Because it was not, consideration of an appeal on those grounds without providing for party status for the resident district would result in a denial of procedural and substantive due process to the resident district.

### 7.   Proximity to Resident and Non-Resident Districts

The appeal also notes the proximity of the McAuliffes' home to PCSD, stating the distance is 1.5 miles. A Google map search from the McAuliffes' address (777 Feedmill

Road, El Dorado, AR) to El Dorado High School (Wildcat Drive, El Dorado, AR) reveals that the distance between the two is 3.2 miles. EDSD submits the difference is not substantial enough to justify any transfer based on proximity.

### 8.    The McAuliffes' Prior Attendance at PCSD was Illegal

The appeal notes that the children, Korbin (9th grade), Kenlee (9th grade), and Krislyn (5th grade) have attended PCSD since kindergarten. Specifically, the McAuliffes stated that "when my three children started Parkers Chapel and the residence question became an issue, my sister who was a longstanding respective teacher was made guardianship (sic) so we could continue with Parkers Chapel as our children's school." A guardianship arrangement such as that described by the letter is illegal. "A student may only use his or her guardian's residential address "if the student resides at the same residential address and if the guardianship . . . is not granted solely for educational needs or school attendance purposes." Ark. Code Ann. § 6-18-202. (See also, *Delta Special Sch. Dist. No. 5 v. McGehee Special Sch. Dist. No. 17*, 280 Ark. 489, 659 S.W.2d 508 (1983)). In that case, several residents of Delta Special School District No. 5 sent their children to McGehee Special School District No. 17 ("McGehee"). The trial court held that "children of one district could attend another district by . . . having 'school guardianships' arranged." *Id.* The Supreme Court found this decision clearly erroneous and stated as follows:

> The guardianships in the present case were established for the sole purpose of evading the law which requires both districts to consent prior to a legal transfer of students between districts. To allow such a subterfuge as presented here might lead to irreparable harm to some districts and could, quite conceivably, lead to recruiting of outstanding athletes and other special students.
>
> We hold that it was error to allow children who reside in and are domiciled in Delta Special School District No. 5 to attend the McGehee schools without the written agreement of both districts.

*Delta Special Sch. Dist. No. 5 v. McGehee Special Sch. Dist. No. 17*, 280 Ark. at 491, 659 S.W.2d at 509.

The McAuliffes' situation is no different. They state in their letter that a guardianship was created for the sole purpose of school attendance. Such an arrangement is expressly prohibited by Ark. Code Ann. § 6-18-202 and *Delta Special Sch. Dist. No. 5 v. McGehee Special Sch. Dist. No. 17*. Granting their appeal would serve as ratification of their previously illegal attendance.

6

### 9.    Conclusion

The appeals state various reasons why these families would like to leave EDSD and enroll their children in PCSD. However, none of those reasons override the federal court order presented by EDSD, as permitted by the Act.

For the foregoing reasons, the McAuliffes' appeal should be denied.    We appreciate your consideration of this response and request an opportunity to be heard at the hearing.

Respectfully submitted,

Allen P. Roberts and Whitney F. Moore
Attorneys for El Dorado School District


cc:    Jim Tucker, Superintendent
El Dorado School District
jtucker@esd-15.org

Michael White, Superintendent
Parkers Chapel School District
401 Parkers Chapel Road
El Dorado, AR 71730

Kevin and Kristi McAuliffe
777 Feedmill Road
El Dorado, AR 71730

7



## PARKERS CHAPEL SCHOOLS

401 Parkers Chapel Road
El Dorado, AR 71730

Michael White
Superintendent
Phone: 862-4641
Fax: 881-5092

Seth Williams
HS Principal
Phone: 862-2360
Fax: 881-5095

June Wells
Fed Pgm/MS Pgm
Phone: 875-1527
Fax: 881-5095

Carrie Burson
Elem. Principal
Phone: 862-9767
Fax: 881-5094

May 11, 2016

Dear Kevin and Kristi McAuliffe

I am sorry, but the applications you submitted for Krislyn, Korbin, and Kenlee have been rejected for the following reason:

__X__ Your children's resident district has declared itself exempt from the provisions of the School Choice Law due to it being under an enforceable desegregation order.

Because off that exemption, your resident school has "Opted Out" of the School Choice Program. I've enclosed some information that will be useful in understanding this situation.

As noted in your original application, you have (ten) 10 days from receipt of this notice in which to submit a written appeal of this decision to the State Board of Education. Feel free to contact me with any questions about this letter.

Respectfully,

Michael J White

Michael J. White

Superintendent

**EXHIBIT**

_____1_____

**ALLEN P. ROBERTS, P.A.**
ATTORNEY AT LAW
325 Jefferson Street S. W.,  P.O. Box 280
Camden, Arkansas 71711-0280
allen@aprobertslaw.com

# FILE COPY

Telephone: (870) 836-5310

Facsimile:  (870) 836-9662

April 20, 2015

**SENT VIA REGULAR MAIL**
**AND EMAIL** (jeremy.lasiter@arkansas.gov)
Jeremy C. Lasiter, General Counsel
Arkansas Department of Education
Four Capitol Mall
Room 404-A
Little Rock, Arkansas 72201

Re:    Act 560 of 2015

Dear Jeremy:

I am writing as the attorney for El Dorado School District (EDSD).  The EDSD school board has again voted for the district to not participate in school choice under the 2013 Act, as amended in 2015.  The reason is that EDSD is a party to least two desegregation lawsuits that are still active:  *Kemp, et al. v. Beasley,* No. ED-1048; and *Townsend, et al., v. EDSD, et al.,* 1:89-CV-1111.  The desegregation obligations of these cases prohibit EDSD from taking any action, or refraining from taking any action, the natural and probable consequence of which would be a segregative impact within EDSD *(i.e.,* the creation, maintaining, or increasing of racially identifiable schools).  Permitting school choice under the 2013/2015 Act would have such an impact.  Allowing school choice would, therefore, be in conflict with EDSD's desegregation obligation still outstanding.

In that same regard, I am enclosing multiple orders from both cases to support this letter. I believe all the information requested by Ark. Code Ann. §6-13-113(b) is included in the enclosures.  If not, please let me know and I'll furnish it.  I know review of these old desegregation lawsuit files is impractical, and sometimes impossible, because of their age and volume.  Therefore, I hope the Court's general retention of jurisdiction in its most recent  (May 3, 2013) order will suffice for this purpose.  ("The Court shall continue to exercise jurisdiction over this matter until it finds that EDSD should be released from Court supervision.") For your convenience, this most recent order is on top of the enclosed documents.

1



**EXHIBIT**
2

Thank you very much.

Sincerely,

El Dorado School District

Allen P. Roberts
Attorney for El Dorado School District

APR/arl

pc:     Jim Tucker
        EDSD Superintendent of Schools

2

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

REV. FRANK TOWNSEND, et al                                    PLAINTIFFS

VS.                               CASE NO. 1:89-cv-1111

BOB WATSON, Individually
and in his Official Capacity as
Superintendent of the El Dorado School
District No. 15, a Public Body Corporate, et al              DEFENDANTS

## ORDER

Before the Court is a Motion for Approval of School Board District Re-zoning filed on behalf of Separate Defendant Board of Education of the El Dorado School District No. 15 ("EDSD"). (ECF No. 30). Also before the Court is EDSD and Plaintiffs' Joint Motion of Defendants and Plaintiffs to Approve Consent Order. (ECF No. 31).

The parties jointly request that the Court approve Option 1 which was passed by the Board of Directors for EDSD on April 30, 2013. Option 1 provides for the redrawing of districts for EDSD school board positions in accordance with Ark. Code Ann. § 6-13-631; provides for a seven-person school board rather than an eight-person board in accordance with Ark. Code Ann. § 6-13-606(g); and converts school board terms from four years to three years in accordance with Ark. Code Ann. § 6-13-608.

Upon consideration, the Court finds that the motions should be and hereby are **GRANTED**. The Court adopts the consent decree agreed to by Plaintiffs and Defendants in their joint motion. The Court approves El Dorado School District's action in changing its governance to a seven member board elected from single member districts with the specific election zones identified as Option 1 in Defendants' motion for approval. The term length of individual board members will be

three years, except for those persons elected in the September 2013 school election who will draw by lot for two 1-year terms, two 2-year terms, and three 3-year terms.

The parties are directed to respond in writing within forty-five days to issues not resolved by the consent order. The Court shall continue to exercise jurisdiction over this matter until it finds that EDSD should be released from Court supervision.

**IT IS SO ORDERED**, this 3rd day of May, 2013.


/s/ Susan O. Hickey
Susan O. Hickey
United States District Judge

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

REV. FRANK TOWNSEND, *et al.*                                    PLAINTIFFS

VS.                                    CASE NO. CIV-89-1111

EL DORADO SCHOOL DISTRICT, *et al.*                              DEFENDANTS

## MOTION

Comes now the defendant El Dorado School District (El Dorado) and moves the Court to
modify its order of July 27, 1992, establishing an eight member school board. In support of its
motion El Dorado states:

1. The modification sought is the creation of a seven member board either each member
elected from a single member district for a four year term. The single member districts will be
substantially equal in population and will be drawn so as to afford black patrons the opportunity
to elect members to the board in proportion to their population in the school district. All seven
positions on the newly constituted school board will be elected in the September 2004 school
elections and, when elected and installed, will replace the existing school board.

2. An exception to the four year term for board members will exist for members elected
to the new board in 2004. The seven elected members will draw by lot for terms with one
position designated as a one year term, two positions designated as two year terms, two positions
designated as three year terms, and two positions designated as four year terms.

-1-

Respectfully submitted,

EL DORADO SCHOOL DISTRICT

By: _____

Allen P. Roberts
Attorney for Defendants
P.O. Box 280
Camden, AR 71711-0280
Telephone: (870) 836-5310
State Bar No. 64036

## CERTIFICATE OF SERVICE

I, Allen P. Roberts, do hereby certify that I have served the plaintiff with the above and foregoing defendants' Motion to Modify Order by mailing a copy to their attorney of record, postage prepaid, to:

John Walker
Attorney at Law
1723 Broadway Street
Little Rock, AR 72206

this _____ day of _____, 2004

_____
Allen P. Roberts

-2-

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

DOSSIE WAYNE KEMP, et al                                        PLAINTIFFS

VS.                                    NO. ED-1048

LEE·ROY BEASLEY, et al                                         DEFENDANTS

## ORDER APPROVING MAGNET SCHOOL PROGRAM

On this __28__ day of __Oct__, 2003, there is presented to the Court a Motion of the separate Defendant, El Dorado School District No. 15 of Union County, Arkansas ("ESD"), to approve a magnet school program referred to as the "School Preference Program" proposed by ESD. The Plaintiffs were duly notified of the Motion of ESD and the Plaintiffs, through their attorney, have executed and filed herein a Waiver of Service, Entry of Appearance, and Consent to Entry of Order.

Based on the Motion of the separate Defendant, ESD, and based on the agreement of the parties, the Court finds as follows:

1.

This Court retains continuing jurisdiction and supervision pursuant to this Court's Order filed August 2, 1971.

2.

The Court has considered the Motion of the separate Defendant, ESD. Based on the Motion and based on the agreement of the parties, the Court finds that the Motion is

164

consistent with the Court's previous Orders, and that it should be, and is hereby, granted.

3.

The Defendant, ESD, is hereby authorized to implement a magnet school program, more particularly described as follows:

(a)   Beginning with the 2003-2004 school year, the ESD organized its five elementary schools serving grades K-4, as magnet schools with the following themes:

| School | Address | Theme |
|---|---|---|
| Hugh Goodwin Elementary | 201 E. 5th El Dorado, AR 71730 | Fine Arts |
| Murmil Heights Elementary | Cherokee & Ripley El Dorado, AR 71730 | Aerospace |
| Northwest Elementary | 1600 N. College El Dorado, AR 71730 | Environmental Studies |
| Rhetta Brown Elementary | Dixie Drive El Dorado, AR 71730 | World Business and Technology |
| Yocum Elementary | 308 S. College El Dorado, AR 71730 | Math, Science and Technology |

(b)   Each student is allowed to designate the order of his or her preference of particular magnet schools, and thus their academic focus.   Assignments are totally within the discretion of the ESD School Board.

(c)   ESD will attempt to gain funding for its' magnet school program through various public and private grants and financial sources, including the United States Department of Education's Magnet School Assistance Program.

(d)    The intent of ESD's magnet school program is to reduce racial isolation and entice students from surrounding districts and private schools to attend the El Dorado School District.

5.

The separate Defendant, ESD, is further authorized to take such other actions as are ordinary, necessary, reasonable, appropriate, and consistent with this Order and previous Orders of the Court, in order to further carry out its magnet school program, otherwise referred to as the "School Preference Program."

IT IS SO ORDERED.

Harry F. Barnes, U. S. District Judge

Date: 10/28/03

U. S. DISTRICT COURT
eSTERN DISTRICT ARKANSA,
FILED

OCT 8 0 2003

JAMES R. JOHNSON, CLERK

DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

Rev. FRANK TOWNSEND, et al                          PLAINTIFFS

VS.                                Case No. 89-CV-1111

BOB WATSON, Individually and in
his Official Capacity as Superintendent
of the El Dorado School District No. 15.
a Public Body Corporate, et al                      DEFENDANTS

### ORDER

Before the Court is Separate Defendant Board of Education of the El Dorado School

District No. 15's Motion for Modification to a Seven Member School Board.  (Doc. 28) .

Plaintiffs have not responded.  Upon consideration, the Court finds the motion should be and

hereby is **granted.**

IT IS SO ORDERED, this 2/ day of July, 2004.

Hon. Harry F. Barnes
U.S. District Court

U.S. DISTRICT COURT
ESTERN DISTRICT ARKANSA
FILED

JUL 28 2004

JOHNSON CLERK
DEPUTY CLERK

AO 72A
(Rev.8/82)

AUG 1971

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

DOSSIE WAYNE KEMP, et al.,        )
                                  )
                 Plaintiffs,      )
                                  )
        v.                        )        NO. ED - 1048
                                  )
LEE ROY BEASLEY, et al.,          )
                                  )
                 Defendants.      )

O R D E R

This matter of school desegregation for the El Dorado School
District No. 15 of Union County, Arkansas, is before the Court
for final determination of a plan for the operation of a unitary,
non-racial, non-discriminatory school system.  The United States
Court of Appeals for the Eighth Circuit, En Banc, on May 4, 1971,
in its order No. 20,507 remanded the matter to the District Court
for further consideration in accordance with the guidelines and
teachings of the United States Supreme Court in Swann v. Charlotte-
Mecklenburg Board of Education, ____ U.S.____; Davis v. Board of
School Commissioners of Mobile County, ____U.S.____; North
Carolina State Board of Education v. Swann, _____ U.S.____; and
McDaniel, Superintendent of Schools v. Barresi, _____U.S.____,
rendered April 20, 1971.

In compliance with the judgment and order of the appellate
court, this Court entered an order dated May 10, 1971, requiring
the Board of Directors of the El Dorado School District No. 15
to file a plan for the operation of its schools which would comply
with the guidelines and teachings of the United States Supreme
Court in the above-cited cases.  The Court included in its order

20

a scheduled hearing on the school district's proposed plan for
Thursday, July 15, 1971.  Pursuant to this Court's order, the
El Dorado School District No. 15 of Union County, Arkansas, filed
a report with the Court on June 15, 1971, which included its
proposed plan for future operation of the schools within the
El Dorado School District effective with the commencement of the
school year 1971-72.  Although this Court's order of May 10, 1971,
provided the plaintiffs shall have twenty days to reply or
otherwise respond to the school district's proposed plan, no
response was received or objections to the report of the defendants
to the Court was filed until July 13, 1971, two days prior to the
scheduled hearing on the defendant's proposed plan.  The primary
objection of the plaintiffs is the closing of Fairview Elementary
School, utilization of Watson School for the 6th Grade instead
of "full-fledged elementary school" and the reopening of Morning
Star and Carver Elementary Schools.  The plaintiffs contend that
the proposed action of the board is racially motivated or will
have a "racial result."

On July 15, 1971, the Court held an evidentiary hearing.  By
stipulation of the parties and from records received as exhibits,
it was agreed and established that the proposed plan of the
school district for the operation of the El Dorado high schools and
the junior high schools comply with the federal standards and
guidelines of the United States Supreme Court in the cases herein-
above cited.  It was further stipulated by the parties that the
testimony would be limited to the proposed operation of the
numerous elementary schools of the district commencing with the
1971-72 school year.

From the evidence and exhibits thereto, it is established that

-2-

at the beginning of the 1970-71 school year there were a total of 6,423 students, 4,227 white students and 2,196 black students. At the close of the school year May 28, 1971, there were 6,376 students.  In the elementary schools, Fairview and Watson were all-black with 284 and 171, respectively.  Northwest, Haskell Heights, West Woods and Yocum elementary schools for the school year 1970-71 were either predominantly white or merely "token integrated".  It is established and admitted that the operation of the elementary schools for the year 1970-71 failed to comply with the guidelines and teachings of the more recent Supreme Court decisions.

In recognition of the above stated facts and assuming its responsibility as more definitely restated in <u>Swann v. Charlotte-Mecklenburg Board of Education,</u> supra, the school board considered five different plans for the operation of the district's elementary schools.  In consideration of the five proposed plans, the school board scheduled and held a public meeting on June 10, 1971.  Pursuant to the public hearing and action of the school board in regular meeting June 14, 1971, Alternative Plan No. 5 was approved with modification that Rock Island Elementary School be used instead of Watson Elementary School for the 6th Grade until an access street from Watson School to U.S. Highway No. 82 of approximately one-fourth mile be completed by the City of El Dorado. Fairview, heretofore an all-black elementary school, would be closed and used as a day-care center for needy and indigent children under school age.  Morning Star, formerly all-black, closed for the school year 1970-71 and utilized as the day-care center last year, would be reopened for 6th Grade assignment with 65 white and 46 black students.  Carver, a previously

-3-

all-black school, closed last year, would be reopened for 6th
Grade assignment with 75 white and 45 black students.[1]

It is established from the proposed plan offered by the
defendant school district that a combination pairing and zoning
is to be used to achieve the proposed results.  In order to carry
out the proposed plan the school district will be required to
provide additional bus facilities and to increase the utilization
of the existing busses.

At the conclusion of the hearing July 15, 1971, the Court
reserved decision and required the school board to further
consider the plan with a view of assigning all six grades to each
of the elementary schools instead of using certain elementary
schools for 6th grade assignment.  The school board was directed
to furnish additional information concerning student assignment
and bus routes.  The policy of "freedom of choice" used heretofore
was eliminated.  The school board was not required to establish
or utilize the principle of "racial balance" but may do so.
No school shall be racially identified.  Neither would token
integration be accepted.

Pursuant to these directives of the Court order of July 16,
1971, the school board filed its report with the Court July 29,

[1]  The 6th Grade students would be assigned as follows:

| Morning Star | 111 | 41%-59% black-white ratio |
| Carver | 120 | 38%-62% black-white ratio |
| Watson | 112 | 33%-67% black-white ratio |

Grades 1 through 5 will be assigned the following schools:

| Northwest | 399 | 33%-67% black-white ratio |
| Yocum | 424 | 40%-60% black-white ratio |
| Westwood | 260 | 41%-59% black-white ratio |
| Murmil Heights | 276 | 29%-71% black-white ratio |
| Hugh Goodwin | 426 | 33%-67% black-white ratio |
| Retta Brown | 284 | 46%-54% black-white ratio |
| Southside | 233 | 48%-52% black-white ratio |

-4-

1971. In effect the board proposes the same plan submitted previously with more detail in the utilization of the various elementary schools, the manner and extent of bussing and further justification for transferring the day-care school from Morning Star to Fairview, affording greater and more convenient services under the direction of the Union County 4-C Council, Inc., for day-care children.

From the record, reports to the Court, ore tenus testimony and exhibits thereto, the Court concludes that for the 1971-72 school year the proposed Alternative Plan No. 5, without the modification of temporary use of Rock Island facilities, would be the most acceptable plan of those considered by the school board. While it would be desirable if each of the elementary schools could accommodate all six grades, with the location of various schools designed and constructed in accordance with housing patterns under previous design for segregation, it appears to be impracticable, and, in fact, beyond the reach of the school district from a realistic viewpoint at this time.

Even though the Court concludes that the district will not be required to establish and maintain a racial balance, it is established that the overall school ratio is approximately 35% black and 65% white. The Alternative Plan No. 5 as being approved by the Court has a minimum ratio of 29% black - 71% white to a maximum ratio of 48% black - 52% white. This appears to comport with the guidelines and teachings of the Swann v. Charlotte-Mecklenburg Board of Education, supra, and other cited cases by the United States Supreme Court April 20, 1971.

IT IS, THEREFORE, CONSIDERED, ORDERED AND ADJUDGED that the defendant, El Dorado School District No. 15 of Union County,

-5-

Arkansas, be and the same is required to operate its various schools of the district, as follows:

1.  All vestiges of "freedom of choice" is eliminated and any further use prohibited. [2/]

2.  The plan of operation for the senior high schools, grades 10, 11 and 12 approved by this Court in its order on April 9, 1969, will continue for the school year of 1971-72 and subsequent years, subject to the continuing jurisdiction and supervision of this Court.

3.  The plan of operation for the junior high schools, grades 7, 8 and 9, approved by this Court April 9, 1969, shall continue for the ensuing school year 1971-72 and subsequent years, subject to the continuing jurisdiction and supervision of this Court.

4.  The plan of operation for the elementary schools of the El Dorado School District, grades 1 through 6, for the year 1971-72, will be in accordance with the School District's Plan No. 5 to include the utilization of Watson as contained therein, without the modification proposed by the Board for the temporary use of Rock Island's facilities.  The Board will provide the Court with further report on the methods of assignment, utilization of the elementary schools and the racial complex at the end of the school year, to include further consideration of pairing or other methods that will achieve the greatest utilization of the school facilities in accordance with the guidelines and teachings of Swann, supra.

---

[2/]  The Board may use "preference" expressed in writing by a student for assignment, but such preference shall be recognized only in the discretion of the board and in no way considered to be a freedom of choice by the student.

-6-

5.   Fairview Elementary School may be used as a "Day-Care Center" in connection with "The Community Coordinated Child Care Program" with the Union County 4-C Council, Inc., El Dorado, Arkansas, as proposed in the Board's report to the Court July 29, 1971. [3/]

IT IS FURTHER ORDERED that the Court maintains continuing jurisdiction and supervision in accordance with the directions of the Supreme Court of the United States and the mandate of the United States Court of Appeals for the Eighth Circuit.

DATED:  August 2, 1971.

_____
UNITED STATES DISTRICT JUDGE

[3/]   Rock Island Elementary School will be closed until such time as the Board determines, with the approval of the Court, its use.

-7-

Opinion No. 2003-269

September 24, 2003

Mr. Raymond Simon, Director
Arkansas Department of Education
#4 Capitol Mall
Little Rock, Arkansas 72201-1071

Dear Mr. Simon:

I am writing in response to your request for an opinion on several questions relating to the "Arkansas Public School Choice Act of 1989," as amended. Specifically, you pose the following questions, which I have numbered below:

1. Assuming that an Arkansas public school district is subject to the authority of a U.S. District Court order requiring that to the extent the school district accepts student transfers from outside the district those transfers must be accepted in a nondiscriminatory manner, can that school district participate in the Arkansas School Choice Act codified at Ark. Code Ann. § 6-18-206?

2. In other words, if a school district is subject to a U.S. District Court order requiring the district to accept students on a nondiscriminatory basis, can that school district accept students into the district irrespective of § (f) of Ark. Code Ann. § 6-18-206?

3. Finally, to the extent that two school districts come in conflict regarding any students that have been accepted into the district under the previously assumed U.S. District Court order and those districts petition the State Board of Education for resolution of that issue pursuant to Ark. Code Ann. § 6-18-206(g), does the State Board of Education have the necessary legal authority to decide that a school district is in compliance



EXHIBIT

3

Mr. Raymond Simon, Director
Arkansas Department of Education
Opinion No. 2003-269
Page 2

> with the Arkansas School Choice Act and may accept students
> outside of the racial parameters called for in Ark. Code Ann. §
> 6-18-206 as long as the district is in compliance with the
> requirements of the assumed U.S. District Court order?

## RESPONSE

I cannot provide an answer to your first and second questions, because the answer
will depend upon the provisions of the applicable U.S. District Court order. In my
opinion the answer to your third question is "no," the State Board of Education
does not have this authority.

*Question 1-- Assuming that an Arkansas public school district is subject to the
authority of a U.S. District Court order requiring that to the extent the school
district accepts student transfers from outside the district those transfers must be
accepted in a nondiscriminatory manner, can that school district participate in
the Arkansas School Choice Act codified at Ark. Code Ann. § 6-18-206?*

*Question 2-- In other words, if a school district is subject to a U.S. District Court
order requiring the district to accept students on a nondiscriminatory basis, can
that school district accept students into the district irrespective of § (f) of Ark.
Code Ann. § 6-18-206?*

The "Arkansas Public School Choice Act of 1989" is codified at A.C.A. § 6-18-
206. It has been amended several times since its original adoption, most recently
by Act 1272 of 2003. This most recent act requires all school districts to
participate in public school choice, rather than making such participation optional
with each school board, as under prior law. The applicable statute sets out a
procedure for a student or his or her parent or guardian to make application for a
transfer of school districts. The statute also sets out, among other things,
requirements pertaining to student transportation and the treatment of "state
equalization aid" with regard to transferring students. Subsection (f) of the statute,
which you reference in your request, provides as follows:

> (f) The provisions of this section and all student choice options
> created in this section are subject to the following limitations:
>
> (1) No student may transfer to a nonresident district where the
> percentage of enrollment for the student's race exceeds that

Mr. Raymond Simon, Director
Arkansas Department of Education
Opinion No. 2003-269
Page 3

percentage in the student's resident district except in the circumstances set forth in subdivisions (2) and (4) of this subsection;

(2) A transfer to a district is exempt from the restriction set forth in subdivision (f)(1) of this section if the transfer is between two (2) districts within a county, and if the minority percentage in the student's race and majority percentages of school enrollment in both the resident and non-resident district remain within an acceptable range of the county's overall minority percentage in the student's race and majority percentages of school population as set forth by the department;

(3) The department shall, by the filing deadline each year, compute the minority percentage in the student's race and majority percentages of each county's public school population from the October Annual School Report and shall then compute the acceptable range of variance from those percentages for school districts within each county. In establishing the acceptable range of variance, the department is directed to use the remedial guideline established in Little Rock School District v. Pulaski County Special School District of allowing an overrepresentation or underrepresentation of black or white students of one-fourth (1/4) or twenty-five percent (25%) of the county's racial balance. In establishing the acceptable range of variance for school choice, the department is directed to use the remedial guideline of allowing an overrepresentation or underrepresentation of minority or majority students of one-fourth (1/4) or twenty-five percent (25%) of the county's racial balance;

(4) A transfer is exempt from the restriction set forth in subdivision (f)(1) of this section if each school district within the county does not have a critical mass of minority percentage in the student's race students of more than ten percent (10%) of any single race;

(5) *In any instance where the foregoing provisions would result in a conflict with a desegregation court order or a district's court-*

Mr. Raymond Simon, Director
Arkansas Department of Education
Opinion No. 2003-269
Page 4

> *approved desegregation plan, the terms of the order or plan shall*
> *govern;*
>
> (6) The department shall adopt appropriate rules and regulations
> to implement the provisions of this section; and
>
> (7) The department shall monitor school districts for compliance
> with this section.

A.C.A. § 6-18-206 (f), as amended by Act 1272 of 2003 (emphasis added).

The emphasized language of subsection (f)(5) above provides for the supremacy
of a desegregation orders or court-approved desegregation plans in the case of a
"conflict" between such orders and plans, on the one hand, and the "foregoing"
provisions of A.C.A. § 6-18-206(f), which outline racial limitations and exceptions
on transfers. Conceivably, therefore, a federal court order could, depending upon
its provisions, have controlling effect over the provisions of A.C.A. § 6-18-206(f).
The question in each instance will be whether the statutory provisions above
actually conflict with any such a federal court order. Resolution of that type of
question will depend upon the provisions of the order in question and any and all
other pertinent facts and laws. I cannot determine this issue in the context of an
official Attorney General opinion. As one of my predecessors stated in Op. Att'y
Gen. 95-066:

> The construction of such [federal court] orders and agreements is
> best left to the parties themselves, or ultimately to the federal
> court. This office has not been provided with a copy of any
> federal court order or settlement agreement, and cannot, in the
> context of an official opinion of the Attorney General, especially
> where the state is not a party, presume to dictate actions to be
> taken under the rubric of such documents.

*Id.* at 2. *See also* Op. Att'y Gen. 94-139 (declining to interpret a federal court
order and stating that "reference to th[e] particular court order, and possibly
clarification from the federal court, would be necessary to resolve the issue
conclusively).

I am therefore unable to render an opinion on your first and second questions
above.

Mr. Raymond Simon, Director
Arkansas Department of Education
Opinion No. 2003-269
Page 5

*Question 3-- Finally, to the extent that two school districts come in conflict regarding any students that have been accepted into the district under the previously assumed U.S. District Court order and those districts petition the State Board of Education for resolution of that issue pursuant to Ark. Code Ann. § 6-18-206(g), does the State Board of Education have the necessary legal authority to decide that a school district is in compliance into with the Arkansas School Choice Act and may accept students outside of the racial parameters called for in Ark. Code Ann. § 6-18-206 as long as the district is in compliance with the requirements of the assumed U.S. District Court order?*

Subsection (g) of A.C.A. § 6-18-206 provides that: "[t]he state board shall be authorized to resolve disputes arising under subsections (b) – (f) of this section."

In my opinion the State Board of Education does not have authority to determine that a school district "is in compliance with the Arkansas School Choice Act" where in order to do so, the Board would have to construe the provisions of a federal district court order and make a determination that it supersedes the racial limitations in subsection (f) of the Arkansas Public School Choice Act. This is essentially a judicial decision. *Cf. State Police v. McCall*, 98 A.D.2d 921, 470 N.Y.S.2d 916 (1983) ("State Human Rights Appeal Board" (a state administrative agency), did not exceed its jurisdiction in construing federal district court order, but only because its decision was supported by other documentary proof and board did not base its decision solely on an interpretation of federal court order).

Disputes involving construction of federal court orders are properly left to the parties thereto, and their respective counsels, or if necessary, to the issuing court itself.

Deputy Attorney General Elana C. Wills prepared the foregoing opinion, which I hereby approve.

Sincerely,

MIKE BEEBE
Attorney General

MB:ECW/cyh



**STATE OF ARKANSAS**
THE ATTORNEY GENERAL
LESLIE RUTLEDGE

Opinion No. 2015-051

July 17, 2015

The Honorable Alan Clark
State Senator
P.O. Box 211
Lonsdale, AR 72087

Dear Senator Clark:

This is in response to your request for my opinion concerning certain provisions of Act 560 of 2015, which amended the Public School Choice Act of 2013. As background for your questions, you state:

> The passage of Act 560 of 2015 (Act) made certain amendments to the primary Arkansas laws governing public school choice and poses several questions with regard to the nature and scope of the obligations placed upon the Arkansas Department of Education (ADE) and public school districts.

> Section 1 of the Act creates a new § 6-13-113 of the Arkansas Code and requires school districts that are subject to a desegregation [sic] or desegregation order to notify the Department of Education in writing by January 1, 2016. The section also requires a school district that is subject to a desegregation order or a desegregation-related order to include in the written notice certain information.

> In Section 6 of the Act, the Act amends Ark. Code Ann. § 6-18-1906, which now states, in pertinent part:

> (a)(1) If the provisions of this subchapter conflict with a provision of an enforceable desegregation court order or a district's court-approved desegregation plan regarding the effects of past



323 CENT[...]        **EXHIBIT**        [...]OCK, ARKANSAS 72201
T[...]                    4                (501) 682-8084
[...]                                      ag.state.ar.us/

The Honorable Alan Clark
State Senator
Opinion No. 2015-051
Page 2

racial segregation in student assignment, the provisions of the order
or plan shall govern.

(2) If a school district claims a conflict under
subdivision (a)(1) of this section, the school district shall
immediately submit proof from a federal court to the Department of
Education that the school district has a genuine conflict under an
active desegregation order or active court-approved desegregation
plan with the interdistrict school choice provisions of this
subchapter.

In light of the foregoing background information, you have posed the following
questions:

1. What are the legal obligations with which a school district must
   comply in order to declare a conflict with the interdistrict school
   choice provisions of the Act?

2. Must a school district provide proof of a conflict on an annual
   basis?

3. If a school district declares a conflict with the interdistrict school
   choice provisions of the Act, what obligations, if any, does the
   ADE have to review a school district's declared conflict to
   determine whether the school district met the requirements of the
   Act?   Specifically, does the ADE have any obligation or
   authority to review the information provided by the school
   district and determine:

   (a) Whether a school district has provided sufficient proof of a
       conflict with a desegregation order or court-approved
       desegregation plan?

   (b) Whether the desegregation order or court-approved
       desegregation plan remain active?

   (c) Whether a genuine conflict exists between the school
       district's desegregation order or court-approved desegregation
       plan and the interdistrict school choice provisions of the Act?

The Honorable Alan Clark
State Senator
Opinion No. 2015-051
Page 3

>   (d) Whether it can require a school district to provide additional
>       information or deny a determination of a limitation of the Act
>       until the information is provided?

4. If a school district declares a conflict with the interdistrict school
   choice provisions of the Act and the ADE is required to make
   any of the determinations set forth in 3(a)-(c) above, is the ADE
   required to provide notice of those determinations? And, if so:

>   (a) To whom must the notice be provided?

>   (b) May a student or a student's parent(s) continue to make
>       application for school choice transfer under the interdistrict
>       school choice provisions of the Act if the ADE has not made,
>       and provided notice of, any of the determinations set forth in
>       3(a)-3(c) above?

>   (c) May a nonresident district accept applications for school
>       choice transfer from a student who resides in a school district
>       which declares a conflict with the interdistrict school choice
>       provisions of the Act if the ADE has not made, and provided
>       notice of, any of the determinations set forth in 3(a)-3(c)
>       above?

5. What is the applicability, if any, of Section 1 of the Act (§ 6-13-
   113) with regard to the remainder of the Act? Is the section
   simply a notice requirement for a school district that does not,
   alone, constitute a declaration that a school district has a conflict
   with any interdistrict school choice provisions governed by the
   remainder of the Act?

**RESPONSE**

With respect to Question 1, the legal obligations on a school district to be able to
claim a conflict with the Public School Choice Act are clear in the statute. The
answer to Question 2 is "no," in my opinion. As to Question 3, in my opinion, the
Arkansas Department of Education does not have the authority to take the actions
about which you have inquired. Question 4 is moot in light of my response to
Question 3. It is my opinion in response to Question 5 that simply providing the
information required by section 1 of Act 560 of 2015, to be codified at Ark. Code

The Honorable Alan Clark
State Senator
Opinion No. 2015-051
Page 4

Ann. § 6-13-113, would not, by itself, serve as a claim of conflict under Ark. Code
Ann. § 16-18-1906(a)(2), as amended by Act 560.

## DISCUSSION

Before addressing your questions, I will summarize the relevant portions of what
is now called the Public School Choice Act of 2015[1] ("the Public School Choice
Act"), as well as the relevant changes made to that act by Acts 2015, No. 560
("Act 560"). The Public School Choice Act[2] sets forth a public school choice
program that is obligatory for each school district[3] unless certain statutory
limitations apply.[4]  One of those limitations is if the transfer conflicts "with an
enforceable judicial decree or court order remedying the effects of past racial
segregation in the school district."[5]  The statute states that "[i]f the provisions of
this subchapter conflict with a provision of an enforceable desegregation court
order or a district's court-approved desegregation plan regarding the effects of past
racial segregation in student assignment, *the provisions of the [court] order or
plan shall govern.*"[6]

---

[1] Ark. Code Ann. § 6-18-1901 *et seq.* (Repl. 2013), *as amended by* Acts 2015, No. 560. Act 560
went into effect on March 20, 2015.

[2] By way of background, in 2012, a federal district court declared an earlier enactment—the
Public School Choice Act of 1989 (formerly codified at Ark. Code Ann. § 6-18-206 (2012)
*repealed by* Acts 2013, No. 1227)—unconstitutional because of the law's explicit race-based
exception to interdistrict transfers. *See Teague v. Ark. Bd. of Educ.*, 873 F. Supp. 2d 1055 (W.D.
Ark. 2012), *vacated by Teague v. Cooper*, 720 F.3d 973 (8th Cir. 2013). The 1989 law provided,
with certain exceptions, that "[n]o student may transfer to a nonresident district where the
percentage of enrollment for the student's race exceeds that percentage in the student's resident
district...." Ark. Code Ann. § 6-18-206(f)(1) (2012). The court's ruling led the General Assembly
in 2013 to repeal section 6-18-206 and to enact a new public school choice law. *See* Acts 2013,
No. 1227.

[3] *See* Ark. Code Ann. § 6-18-1903(b) (Repl. 2013) ("Each school district shall participate in a
public school choice program consistent with this subchapter.")

[4] These limitations are found at Ark. Code Ann. § 6-18-1906 *as amended by* Act 560.

[5] Ark. Code Ann. § 6-18-1901(b)(3) (Repl. 2013).

[6] Ark. Code Ann. § 6-18-1906(a) (Repl. 2013) (renumbered as subsection (a)(1) by Act 560)
(emphasis added).

The Honorable Alan Clark
State Senator
Opinion No. 2015-051
Page 5

One significant change made by Act 560 to the Public School Choice Act was an attempt to require proof from a school district that wishes to claim an exemption from the Public School Choice Act because of a desegregation-related court order. Before Act 560, a school district that wished to exempt itself from school choice needed only to declare annually that "the school district is subject to the desegregation order ... remedying the effects of past racial segregation."[7] This declaration was irrevocable for one year and could be renewed each year by notice to the ADE. A school district's board of directors also had the option, after an exemption year, "to elect to participate in public school choice under this section if the school district's participation does not conflict with the school district's federal court-ordered desegregation program."[8]

Act 560, however, repealed that provision and added a new subsection that states:

If a school district claims a conflict under subdivision (a)(1) of this section, the school district shall immediately submit proof from a federal court to the Department of Education that the school district has a genuine conflict under an active desegregation order or active court-approved desegregation plan with the interdistrict school choice provisions of this subchapter.[9]

This new language imposes more of a burden on a school district. It is no longer sufficient for a school district to simply declare itself exempt because of a court's desegregation order. Now, the school district seeking exemption must submit to the ADE "proof from a federal court [of] a genuine conflict" with such an order. Act 560, however, provides no guidance as to what would be both necessary and sufficient to constitute such "proof" from a federal court. It is similarly silent as to what the ADE is supposed to do with such proof once it is submitted.

Act 560 also added a new section within the general provisions chapter regarding school districts.[10] That section requires a school district to provide the ADE written notice by January 1, 2016 that the district is subject to a desegregation or

---

[7] Ark. Code Ann. § 6-18-1906(b) (Repl. 2013).

[8] Id.

[9] Act 560, § 6 at p. 5 (to be codified at Ark. Code Ann. § 6-18-1906(a)(2)).

[10] Id. at § 1 (to be codified at Ark. Code Ann. § 6-13-113).

The Honorable Alan Clark
State Senator
Opinion No. 2015-051
Page 6

desegregation-related order.[11]  This notice also must contain certain information about that school district's existing desegregation orders.[12]  Moreover, that section requires school districts that are released from court supervision related to such orders to "promptly notify" the ADE.[13]  Additionally, the ADE is to post all such written notifications on its website.[14]  School districts that fail to meet these requirements will be deemed in violation of state accreditation standards.[15]

With this summary of the law and the relevant changes brought by Act 560 in mind, I will now respond to your particular questions.

### Question 1: What are the legal obligations with which a school district must comply in order to declare a conflict with the interdistrict school choice provisions of the Act?

In my opinion, Act 560 makes clear what a school district must do if it claims a conflict with the provisions of the Public School Choice Act. The school district "shall immediately submit proof from a federal court to the Department of Education that the school district has a genuine conflict under an active desegregation order or active court-approved desegregation plan with the interdistrict school choice provisions of this subchapter."[16]  Beyond stating this obligation, however, the statute is silent. As noted above, there is no indication or guidance as to what would be both necessary and sufficient to constitute such "proof from a federal court."

---

[11] *Id.* (to be codified at Ark. Code Ann. § 6-13-113(a)).

[12] *Id.* (to be codified at Ark. Code Ann. § 6-13-113(b)). The information required by the statute comprises 1) a copy of the court's desegregation or desegregation-related order; 2) the case heading and case number of each case in which the order was entered; 3) the name and location of each court with jurisdiction over such orders; and, 4) a description of the school choice student transfer obligations related to such order to which the school district may be subject.

[13] *Id.* (to be codified at Ark Code Ann. § 6-13-113(c)).

[14] *Id.* (to be codified at Ark Code Ann. § 6-13-113(e)).

[15] *Id.* (to be codified at Ark Code Ann. § 6-13-113(d)).

[16] Act 560 at § 6, p. 5 (to be codified at Ark. Code Ann. § 6-18-1906(a)(2)). The Public School Choice Act places other limitations on school districts' abilities to accept school choice transfers, such as a numerical net maximum limit on such transfers. *See id.* at § 6, p. 6 (to be codified at Ark. Code Ann. § 6-18-1906(b)). Because the other limitations do not appear to be the focus of your inquiry, I only mention them here.

The Honorable Alan Clark
State Senator
Opinion No. 2015-051
Page 7

*Question 2: Must a school district provide proof of a conflict on an annual basis?*

"No," in my opinion.  The Public School Choice Act, as amended by Act 560, contains no language requiring annual declarations or renewals.  As stated above, Act 560 repealed the law granting school districts the option to declare an exemption from school choice each year.[17]

Moreover, as a practical matter, there would be no need for a school district to resubmit its proof of a conflict.  A court's desegregation order to a school district remains in place, as written, until it is lifted, modified or, by its own terms, comes to an end.  A lower court's order also could be overturned or vacated by a higher court. Absent such a change, however, the school district's conflict remains.

*Question 3: If a school district declares a conflict with the interdistrict school choice provisions of the Act, what obligations, if any, does the ADE have to review a school district's declared conflict to determine whether the school district met the requirements of the Act?  Specifically, does the ADE have any obligation or authority to review the information provided by the school district and determine (a) whether a school district has provided sufficient proof of a conflict with a desegregation order or court-approved desegregation plan; (b) whether the desegregation order or court-approved desegregation plan remain active; (c) whether a genuine conflict exists between the school district's desegregation order or court-approved desegregation plan and the interdistrict school choice provisions of the Act; and (d) whether it can require a school district to provide additional information or deny a determination of a limitation of the Act until the information is provided?*

This question seems to boil down to whether the ADE can or must make a determination as to the veracity of a school district's claim of a conflict and/or the adequacy of the "proof" it has submitted.  The question also asks whether the ADE can require a school district to provide additional information (presumably if the proof is in some way deemed "insufficient") or deny a school district's excusal from the Act until the information is provided.

In my opinion, the ADE is neither authorized nor obligated to take the actions contemplated.  As mentioned above, the law is silent on what, if anything, the

---

[17] *See* text accompanying notes 7-9 *supra.*

The Honorable Alan Clark
State Senator
Opinion No. 2015-051
Page 8

ADE is supposed to do with the "proof" that a school district submits. The Public School Choice Act, as amended by Act 560, does not charge the ADE to undertake to verify a school district's claim of exemption[18] or make a determination as to the sufficiency or truth of the proof submitted.[19]  Nor has my research yielded any other law assigning such a role to the ADE.

I will note that this may raise a problematic aspect of the new law.  Suppose, for instance, a school district submits "proof" that is patently inadequate to show a "genuine conflict" with the Public School Choice Act.  I see no clear procedure under the law for challenging such a submission.  I can speculate that a parent of a student would mount a challenge by seeking relief from a court of competent jurisdiction in such a case.  But the law is not clear in this regard, suggesting the need for legislative clarification.

***Question 4: If a school district declares a conflict with the interdistrict school choice provisions of the Act and the ADE is required to make any of the determinations set forth in 3(a)-(c) above, is the ADE required to provide notice of those determinations? And, if so: (a) To whom must the notice be provided; (b) May a student or a student's parent(s) continue to make application for school choice transfer under the interdistrict school choice provisions of the Act if the ADE has not made, and provided notice of, any of the determinations set forth in 3(a)-3(c) above; and (c) May a nonresident district accept applications for school choice transfer from a student who resides in a school district which declares a conflict with the interdistrict school choice provisions of the Act if the ADE has not made, and provided notice of, any of the determinations set forth in 3(a)-3(c) above?***

This question is rendered moot in light of my response to Question 3.  As a

---

[18] It is my understanding that the ADE takes the position that it is neither authorized nor equipped to construe federal court desegregation orders issued to individual school districts for the purposes of the Public School Choice Act.

[19] The ADE does not appear to assume this authority either, according to its proposed "Rules Governing the Public School Choice Act of 2015," found at http://www.arkansased.gov/public/userfiles/Legal/Legal-Pending%20Rules/Public_School_Choice_Draft_for_Public_Comment_April_2015.pdf (last accessed June 10, 2015).  It is well established that the construction of a state statute by an administrative agency, while not binding, is afforded great deference by the courts and will not be overturned unless it is clearly wrong. *See e.g.*, *Brookshire v. Adcock*, 2009 Ark. 207, 307 S.W.3d 22, 26; *Ford v. Keith*, 338 Ark. 487, 494, 996 S.W.2d 20, 25 (1999).

The Honorable Alan Clark
State Senator
Opinion No. 2015-051
Page 9

general matter, however, I will note that the ADE has no notification
responsibilities to parents of students under the Public School Choice Act.

*Question 5: What is the applicability, if any, of Section 1 of the Act (§ 6-13-113)*
*with regard to the remainder of the Act?  Is the section simply a notice*
*requirement for a school district that does not, alone, constitute a declaration*
*that a school district has a conflict with any interdistrict school choice*
*provisions governed by the remainder of the Act?*

Upon codification as Ark. Code Ann. § 6-13-113, section 1 of Act 560 will be
found in chapter 13 of Title 6, whereas the Public School Choice Act is found in
chapter 18. Thus, standing alone, section 1 of Act 560 will not be found as part of
the Public School Choice Act.  However, that section does have a tangential
relation to the Public School Choice Act.  One of the pieces of information it
requires school districts to submit to the ADE by January 1, 2016 is a "description
of the school choice transfer obligations, if any, the school district is subject to,
related to that [desegregation] order." [20]

As to whether the submission required by section 1 of Act 560 would, by itself,
serve as the claim of a conflict under Ark. Code Ann. § 6-18-1906, the answer is
"no," in my opinion. The language of Ark. Code Ann. § 6-18-1906, as amended
by Act 560, requires that a school district claiming a conflict with the Public
School Choice Act because of a court desegregation order take an action to assert
such conflict by submitting "proof" from a federal court to the ADE. Again, what
constitutes such "proof" and how its sufficiency and veracity is to be determined
are matters left unaddressed by the Public School Choice Act, as amended by Act
560.

Assistant Attorney General Ray Pierce prepared this opinion, which I hereby
approve.

Sincerely,

LESLIE RUTLEDGE
Attorney General

LR/RP:cyh

---

[20] Act 560, § 1 (to be codified at Ark. Code Ann. § 6-13-113(b)(4)).

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

U. S. District Court
Western Dist. Arkansas
F I L E D
October 15, 1964
Truss Russell, Clerk,
By Marguerite Beaver
Deputy Clerk.

DOSSIE WAYNE KEMP, A Minor, MARJORIE KEMP, A
Minor, BETTY LOU KEMP, A Minor, by their mother
and next friend, MRS. G. L. KEMP; LORETTA JOYCE
LOCKHART, A Minor, by her mother and next friend,
MRS. EXIE LOCKHART; MARY LEE DORCH, A Minor, and
JOHNNIE LEE DORCH, A Minor, by their father and
next friend, JUDGE DORCH                    PLAINTIFFS

-vs-        Civil Action Number *1048*

LEROY BEASLEY, Mrs. KENNETH WIEMER, JR., W. M. PAUL,
MRS. JACK CLAWSON, DR. PAUL HENLEY and W. A. STARK,
Board of Directors of the El Dorado School District
Number 15 of El Dorado, Arkansas

G. A. STUBBLEFIELD, Superintendent of the El Dorado
School District Number 15 of El Dorado, Arkansas

THE EL DORADO SCHOOL DISTRICT NUMBER 15 of
EL DORADO, ARKANSAS, A Corporation          DEFENDANTS

## C O M P L A I N T

### I.

(a) Jurisdiction of this Court is invoked under Title 28
United States Code, Section 1331, this being a civil action that
arises under the Constitution and laws of the United States where-
in the matter in controversy exceed the sum of Ten Thousand
($10,000.00) Dollars, exclusive of interest and costs, and Title
42, Section 1981 and 1983, United States Code, this being an action
in which citizens of the United States contend that they have been,
and are now being denied equal rights under the Constitution and
laws of the United States and thus deprived of their civil rights
in violation of the Constitution and laws of the United States.

EXHIBIT
5

-2-

(b) Jurisdiction is further invoked under Title 28, Section 1343(3), United States Code, this being an action for the redress of the deprivation under color of law, of rights, privileges and immunities secured to them as citizens of the United States by the Constitution and laws of the United States.

II.

This is a proceeding for a preliminary and permanent injunction enjoining the El Dorado School District #15, its Board Members and its Superintendent, from continuing a policy, practice, custom and usage of discriminating against the plaintiffs and other Negro citizens of El Dorado, Union County, Arkansas, because of race or color, and for relief as hereinafter more fully appears.

III.

1. Adult plaintiffs, Mrs. G. L. Kemp, Mrs. Exie Lockhart and Judge Dorch, allege that they are citizens of the United States and of the State of Arkansas; that they are residents of El Dorado, Union County, Arkansas; that they are members of the Negro race as defined by Arkansas law. (Arkansas Statute (1947) Section 41-808).

2. Minor plaintiffs allege that they are minors; that they are citizens of the United States and of El Dorado, Union County, Arkansas; that they are members of the Negro race and that they bring this action by their next friends pursuant to Rule 17(c), Federal Rules of Civil Procedure.

3. Minor plaintiffs allege that they are of public school age; that they have met all requirements for admission to the public schools in the El Dorado School District #15 of El Dorado, Arkansas.

4. Minor plaintiffs allege that they bring this action in their own behalf and in behalf of all other Negro minors within the El Dorado School District #15 of El Dorado, Arkansas, who are

-3-

similarly situated because of race and color and affected by the
policy, practice, custom and usage complained of herein; that they
are members of a class of persons who are segregated in the use and
enjoyment of the public schools within the El Dorado School District
#15 of El Dorado, Arkansas, and discriminated against by the defendants
because of the race and color of minor plaintiffs; that the members
of the class of persons that they represent are so numerous as to
make it impracticable to bring them all before this Court; that
they, as members of the class, can and will adequately and fairly
represent all of the members of the class; that the character of
the right sought to be enforced and protected for the class is
several, and that there are common questions of law and fact
affecting the several rights of all of the class, and a common
relief is sought; that they bring this action as a class action
pursuant to Rule 23(a) (3), Federal Rules of Civil Procedure.

5. Plaintiffs allege that the defendant, Board of Directors
of the El Dorado School District #15 of El Dorado, Arkansas, is a
body corporate with power to sue and be sued in its corporate name
and capacity and that it is hereby sued in its corporate name and
capacity; that the Board of Directors of the El Dorado School
District #15 of El Dorado, Arkansas is vested with the power and
authority to make and enforce rules and regulations for the manage-
ment and control of the public schools within the said school
district.

6. Plaintiffs allege that the defendant, the El Dorado School
District #15 of El Dorado, Arkansas, a corporation, is a political
sub-division of the State of Arkansas; that it is an administrative
agency and an instrumentality of the State exercising functions and
performing duties under the general education laws of the State of
Arkansas.

3

-4-

7. Plaintiffs allege that the defendants, Leroy Beasley, Mrs. Kenneth Wiemer, Jr., W. M. Paul, Mrs. Jack Clawson, Dr. Paul Henley and W. A. Stark, are the duly elected, designated, qualified and acting members of the Board of Directors of the El Dorado School District #15 of El Dorado, Arkansas; that they, and each of them, are citizens of the United States and the State of Arkansas, domiciled in Union County; that they hold office and perform official duties and functions under the general education laws of the State of Arkansas, and that they, and each of them, are sued in their official capacities.

8. Plaintiffs allege that defendant, G. A. Stubblefield, is the duly appointed, qualified and acting superintendent of the public schools within the El Dorado School District #15 of El Dorado, Arkansas; that he is a citizen of the United States and of Union County, Arkansas; that he is the agent and servant of the defendant, the El Dorado School District #15 of El Dorado, Arkansas, a corporation; that he holds office and performs official duties and functions pursuant to the general education laws of the State of Arkansas, and that he is sued herein in his official capacity.

9. The defendants, acting under color of the authority vested in them by the laws of the State of Arkansas, have pursued and are presently pursuing a policy, custom, practice and usage of operating the public school system of the El Dorado School District #15 of El Dorado, Arkansas, on a basis that discriminates against plaintiffs and other Negroes similarly situated because of race or color, to wit:

(a) All Negro students in the El Dorado School District #15 of El Dorado, Arkansas, are initially assigned by the defendants to the Washington High School, Carver, Morning Star, Rock Island, Watson and Fair View grade schools, which are limited to Negro children only.

4

That all white students in the El Dorado School District #15 of El Dorado, Arkansas are initially assigned to schools limited by the defendants to white children.  Teachers, principals, and other professional personnel are assigned to the schools by the defendants on the basis of race with only Negro personnel assigned to Negro schools, and only white personnel assigned to white schools.

(b) On July 6, 1964, plaintiffs made written application for transfer to the El Dorado High School of El Dorado, Arkansas, which is attended only by white children, and which is nearer to their residences than the Washington High School, which is attended only by Negro children.

(c) On or about August 25, 1964, the day that the 1964-65 school term commenced, plaintiffs received a letter from the superintendent of schools advising plaintiffs that their request for transfer had been denied.

IV.

Plaintiffs allege that the policy, custom, practice and usage of the defendants in requiring plaintiffs and other Negro children similarly situated to attend all-Negro schools in the El Dorado School District #15 of El Dorado, Arkansas violates the rights of the plaintiffs and others similarly situated as guaranteed in the equal protection and due process clauses of the Fourteenth Amendment to the Constitution of the United States and Title 42, United States Code, Section 1983.

V.

Plaintiffs and each of them and these similarly situated have suffered and will continue to suffer irreparable injury and harm

-6-

caused by the acts of defendants herein complained of. They have no plain, adequate or complete remedy to redress these wrongs other than this suit for injunctive relief. Any other remedy would be attended by such uncertainties and delay as to deny substantial relief, would involve a multiplicity of suits, cause further irreparable injury and occasion damage, vexation and inconvenience to the plaintiffs and those similarly situated.

WHEREFORE, plaintiffs respectfully pray that this Court advance this cause on the docket and order a speedy hearing of this action according to law and after such hearing to enter a preliminary and permanent decree enjoining the defendants, their agents, employees and successors:

1. From assigning plaintiffs to any school other than the one to which they would have been initially assigned to if they were white;

2. From operating a biracial school system in the El Dorado School District #15 of El Dorado, Arkansas;

3. From assigning students to schools in the El Dorado School District #15 on the basis of race and color of the students;

4. From assigning teachers, principals and other professional school personnel to the schools of the El Dorado School District #15 of El Dorado, Arkansas on the basis of the race and color of the children attending the school to which the personnel is to be assigned.

6

-7-

In the alternative, plaintiffs pray that this Court enter a decree directing the defendants to present a complete plan, within a period of time to be determined by this Court, for the reorganization of the school system of the El Dorado School District #15 of El Dorado, Arkansas on a unitary, nonracial basis, the assignment of teachers, principals and other professional school personnel on a nonracial basis, and the elimination of any other discrimination in the operation of the school system based solely upon race and color.  Plaintiffs pray that should this Court direct the defendants to produce a desegregation plan that this Court retain jurisdiction of this case pending approval and full implementation of defendants' plan.

Plaintiffs pray that this Court will allow them their costs herein and grant such further, other, additional or alternative relief as may appear to the Court to be equitable and just.

_____
(Mrs.) G. L. Kemp

_____
(Mrs.) Piedy Meekins

_____
(Mrs.) Exie Lockhart

_____
Judge Dorch

George Howard, Jr.
329½ Main Street
Pine Bluff, Arkansas

Jack Greenberg,
Derrick A. Bell, Jr. and
John Walker
10 Columbus Circle
New York 19, New York,

Attorneys for Plaintiffs

By _____
George Howard, Jr.

7



## PULASKI COUNTY SPECIAL SCHOOL DISTRICT

925 East Dixon Road/P.O. Box 8601
Little Rock, Arkansas 72216-8601

July 24, 2015

Ms. Whitney Moore
Fuqua Campbell P.A.
Riviera Towers
3700 Cantrell Road, Suite 205
Little Rock, Arkansas 72202

Dear Ms. Moore:

At your request, I have read Bob Watson's report dated December 16, 2011, and my report of December 13, 2011, and addendum of January 23, 2012, copies of which are attached. I believe these documents remain a true and correct description of the situation that exists today in southern Arkansas. Any school district with a substantial black enrollment bordered by a school district or districts with an enrollment that is substantially white will suffer rapid re-segregation due to white flight if it participates in school choice. This is illustrated by what happened in the Malvern School District with a black enrollment of *circa* 35% in 2013-14 and 2014-15 when it participated in school choice. According to ADE statistics, the total transfers out of Malvern in 2013-14, substantially all to surrounding "white" districts, were 118, only one of whom was black. In 2014-15 the total number transferring out of Malvern was 109, only two of whom were black. To summarize this, under school choice there was a substantial movement of white students out of the Malvern district to predominantly white surrounding districts.

I understand this letter will be presented to the Arkansas State Board of Education to support denying school choice appeals by white parents seeking school choice transfers out of the Lafayette County School District into either Emerson-Taylor-Bradley school district or Spring Hill School District.

Sincerely,

Dr. Jerry Guess
Superintendent of Schools

**EXHIBIT**
6

# JERRY D. GUESS

178 Gray Fawn Trail
Camden, Arkansas 71701
870-837-2575 - home
870-818-7442 – cell

January 23, 2012

Mr. Allen P. Roberts
325 Jefferson Street
P.O. Box 280
Camden, AR 71711

Dear Mr. Roberts;

You asked me to prepare an addendum to my previous report dated December 13, 2011, if I could accurately discuss the history of desegregation in Arkansas from 1954 to 1970. I believe I can, and that discussion, including the basis for my statements, follows.

I wrote my doctoral dissertation on desegregation in Ouachita County, Arkansas public schools. In preparing and writing that dissertation I studied and became familiar with the history of desegregation of public education in Arkansas generally, and south Arkansas in particular. I also "lived" most of the experience graduating from Chidester High School (Ouachita County) in 1969. I was born in 1950, and raised and educated in the public schools of Ouachita County. I am a public school teacher and administrator by profession and experience. Most of my professional employment has been in Ouachita County public schools beginning in 1978. My *curriculum vitae* is attached to my earlier report submitted herein.

In addition to my doctoral studies, I also accumulated knowledge used to state the facts, opinions, and conclusions contained herein by preparing and testifying on desegregation before various *ad hoc* and standing groups of Arkansas legislators and other groups over the past ten years. That work was virtually always done jointly in concert with my colleague, the superintendent of El Dorado School District, Robert Watson. This collaboration armed me with an even better knowledge of the desegregation history of El Dorado School District than I had acquired in my studies and personal experience. All of this together enables me to state that the desegregation history of Chidester, Camden, Fairview, and El Dorado school districts, *circa* 1954-1971, is virtually identical.

At the time of *Brown v. Board of Education,* all four of the districts mentioned operated two school systems, one for blacks and one for whites. It would be more accurate, because of the multiple classifications of race and ethnicity used today, to say that these districts operated two separate education systems, one for non-blacks and the other for blacks. I say this because all ethnic identifications except black, *e.g.,* white, oriental, Hispanic, American Indian, *etc.,* went to the "white" schools, while all children with any black ancestry were relegated to the black schools.

Desegregation under *Brown* began in the last half of the 1950s motivated by both court litigation and administrative intervention through the federal Health, Education, and Welfare Department (HEW). Fairview, Chidester, Camden, and El Dorado all operated in these early years under court or agency approved "freedom-of-choice" desegregation plans. Under these arrangements both the white (non-black) schools and the black schools remained open, but with the districts ordered to permit students to attend either, regardless of race. No meaningful desegregation occurred under freedom-of-choice. I believe without exception *all* non-black (white) students continued to attend the white schools, while substantially all black children continued to attend the "black" schools. This remained the case until 1969 when HEW decided it would no longer approve federal funding for school districts with freedom-of-choice desegregation plans. This left the four school districts under discussion with virtually no choice for 1969-70 and beyond. Each immediately closed its "black schools" and merged its black and non-black student bodies in the former "white schools."[1]

Camden High School in the Camden School District was typical of the four districts under freedom-of-choice. My research indicates that 1965 was the first year of any desegregation, which was by freedom-of-choice. In 1965 only five black children attended the "white" schools, all at Camden High School with a total enrollment of *circa* 700. Though some new children came and some graduated, the total black enrollment at CHS remained at four to six students until *circa* 1969. The eighth grade class in the black school had no whites, and the eighth grade class in the white school had no blacks. Camden School District merged these two eighth classes into the entering ninth grade class at existing Camden High School in 1969. After the 1969 HEW order a new high school facility was completed and all high school grades, as well as all the elementary grades, were merged in 1970.

Camden, Chidester, Fairview, and El Dorado school districts shared the above-described 1954-71 desegregation history. It is my opinion that this history was identical to that of virtually all other similarly situated south and central Arkansas school districts.

Please let me know if there are questions.

Sincerely,

Jerry D. Guess

---

[1] Camden actually sought and received a partial time-waiver from HEW of the order to "immediately" merge the student bodies because a new high school facility large enough to accommodate both white and black enrollments was already under construction. Therefore, the total black/white merger occurred in Camden in 1970, rather than 1969 as it did for Chidester, El Dorado, and Fairview.

 **PULASKI COUNTY SPECIAL SCHOOL DISTRICT**

Office of the Superintendent

December 13, 2011

Mr. Allen P. Roberts
325 Jefferson
P.O. Box 280
Camden, AR  71711

Dear Mr. Roberts:

I'm Jerry Guess and am authoring this report in response to your request that I express my opinion on this question: What would be the impact on the racial composition of public school districts in Ouachita County, Arkansas, specifically, as well as south central Arkansas generally, of free and unrestricted school choice? A recent resume' of mine is attached as a *curriculum vitae*. This school year is my first as superintendent of Pulaski County Special School District. I spent the thirteen years immediately proceeding this year as superintendent of Camden Fairview School District. The basis of the opinion stated herein is my experience in public education, particularly as the superintendent of a south Arkansas school district.

It is my opinion that free and unrestricted school choice would result in rapid and complete segregation of public education in Ouachita County. That is because there are multiple districts in greater Ouachita County of varying racial composition. My experience has taught me that the racial composition of a school or school district is overwhelmingly the most important factor to most white parents in selecting a school for their children: The "whiter" the school or district the more effort and energy white parents will expend to get their children into the "whiter" district and out of the "blacker" districts. My experience has also taught me that racial composition is *not* usually a factor in school or district selection for most black parents. Explaining this phenomenon is beyond both my expertise and the scope of this report. What I do know is that these observations have been universally true for my entire experience in public education.

I've also learned from experience that there is another factor in the equation. Public school districts are "size- competitive." I honestly believe that 100% of school superintendents would choose to have their district growing and expanding rather than shrinking or even stagnant. Of course, there are multiple components of this phenomenon. Two of the most obvious are that public school financing is generally based on a *per capita* approach; and that enrollment growth is generally considered a sign of administrative success. Whatever the explanation, I believe the observation has a universality that makes it tantamount to a truth. When you add this phenomena to the racial preference observations expressed above, the conclusion of white flight is inevitable.

925 East Dixon Road ◊ Little Rock, Arkansas 72206
Phone: (501) 234.2001 ◊ Fax: (501) 490-0483 ◊ Email: jguess@pcssd.org

December 13, 2011
Page 2

There are five school districts with substantial territory in Ouachita County: Camden Fairview, Bearden, Harmony Grove, Smackover, and Stephens. The present racial demographics of these districts are shown is Exhibit A.

It is my opinion that removing residence and race as restrictions on Ouachita County school attendance would result in Camden Fairview and Stephens becoming virtually all black due to their remaining students "choicing" out to Harmony Grove and Smackover. The immediate impact would be substantial. The only reason this would not happen immediately for Camden Fairview and Stephens is that it might take some time for Harmony Grove and Smackover to expand their personnel and facilities to accommodate all the white children desiring to attend.

I believe the same result would occur between Bearden and Harmony Grove with the only difference being that it would take longer, *e.g.,* four or five years as opposed to one or two years. This is because the black enrollment of Bearden is *only* 41%. However, as stated above, my experience has been that there is no specific black percentage enrollment that leads to "white flight." Rather it is that there is a "whiter" district nearby. To me this point is illustrated by the present litigation involving as it does white student residents of Malvern School District seeking to leave Malvern for a nearby district. The last time I checked Malvern had a black enrollment of about 31%. My point is this: Malvern would be a "white flight" district if it were situated next door to Camden Fairview with 61% black enrollment or El Dorado with a 50% black enrollment. It is not the number of blacks attending Malvern; it is solely the availability of a nearby "whiter" alternative.

Finally, I believe that Ouachita County is in no way unique among surrounding south central Arkansas counties. The counties and school districts with which I am most familiar are virtually identical to Ouachita County in the factors discussed. They are Union, Columbia, and Hempstead. Each county now has a total population with blacks and whites about evenly divided. Each county has one centrally located "county seat" school district (*i.e.,* Camden Fairview, El Dorado, Magnolia, and Hope school districts). See Exhibit B. Each of these "county seat" districts historically operated a racially dual system which was desegregated in the early 1970s by closing the black system and merging its enrollment with the white system. Finally, each of the four counties has one or more smaller and whiter districts located near the blacker county seat district.

In my opinion, free and unrestricted school choice would rapidly result in each of these counties having a racially segregated public education system. Furthermore, I believe this combination of demographics and school district organization predominates across the span of south Arkansas. It is my opinion that wherever that combination occurs free and unrestricted school choice would result in racially segregated public education.

Regards,


Jerry D. Guess
Superintendent of Schools

# JERRY D. GUESS

178 Gray Fawn Trail
Camden, Arkansas 71701
870-837-2575 – home
870-818-7442 – cell

## Education

| | |
|---|---|
| **Ed. D.**, | 1997, University of Arkansas at Little Rock, Little Rock, AR |
| | Dissertation: *Desegregation Through Consolidation: A Historical Case Study of the Formation of the Camden Fairview School District* |
| **M.Ed.**, | 1989, University of Arkansas, Fayetteville, AR |
| | Educational Administration |
| **B.A.**, | 1973, Southern State College, Magnolia, AR |
| | English major, history minor |
| **Diploma** | 1969, Chidester High School, Chidester, AR |

## Professional Experience

**Superintendent**, Pulaski County Special School District (PCSSD)
(2011-Present)

**Superintendent**, Camden Fairview School District (CFSD) (1996-2011)

**Associate Superintendent,** CFSD, (1994-1996)

- Curriculum and Instruction Director K-12
- Coordinator of staff development, technology program, early childhood programs, and special programs
- Acting Personnel director (1994)

**Assistant Superintendent**, CFSD (1992-1994)

- Developed desegregation program and budget
- Assisted superintendent and board of education in annexation of Camden School District to Fairview School District
- Special Education and Gifted /Talented Program Oversight
- Compensatory Education Coordinator
- Grant writer, K-12

**Principal**, Fairview Middle School, Fairview School District (FSD) (1990-1992)

- Supervised and evaluated all staff members regarding continued employment and performance improvement
- Responsible for coordination and refinement of mathematics and language curriculum

- Developed and implemented comprehensive rewards and incentives

**Assistant Principal**, Fairview Middle School, FSD (1986-1990)

- Responsible for discipline, attendance, home-school relations
- Coordinated textbook selections and purchases for all curricular areas
- Chaired in-service, teacher center and six-year plan committees
- Assisted superintendent and board of education in consolidation of Chidester School District and Fairview School District

**Gifted and Talented Coordinator**, FSD (1985-1990)

- Conducted district-wide needs assessment
- Designed and implemented gifted and talented identification and service models for K-12
- Initiated and implemented ADE-sponsored Academic Enrichment for Gifted in Summer (AEGIS) program, Engineering, Management Exploration, serving 30 residential students for two weeks

**Classroom Teacher**, Fairview High School, FSD (1978-1986)

- Taught language arts, 10,11, and 12, yearbook and newspaper
- Public relations coordinator for the school district
- Organized, developed, and taught honors creative writing class
- FHS Teacher of the Year, 1984

## Professional Organizations and Accomplishments

- Member and President (2010-11), Arkansas Association of School Administrators
- Member and Vice-President (2011-12), Arkansas Association of Supervision and Curriculum Development
- Member, Arkansas Professional Licensure Standards Board
- Arkansas Superintendent of the Year, 2008
- Member and President, Board of Trustees, Southern Arkansas University
- Chair, Southern Arkansas University Presidential Search Committee
- Member, National Association of Supervision and Curriculum Development
- Member, National Organization for Legal Problems in Education
- Member, Board of Directors, and presenter, Arkansans for Gifted and Talented Education
- Member, Board of Directors, and presenter, Arkansas Association of Middle Level Educators
- Member and Board of Directors, Environmental and Spatial Technologies Initiative

- Member and Board of Directors, Arkansas Association of School Administrators
- Member, Phi Kappa Phi.

## Selected Community Activities and Honors

- Member and Board of Directors, Camden Area Chamber of Commerce
- Member and Board of Directors, Ouachita County Farm Bureau
- Member and past president, Camden Kiwanis Club
- Member and Board of Directors, Ouachita Partnership for Economic Development, Inc.
- Meritorious Service Award 2002, SAU-Tech
- Community Service Award 2001, Camden Area Chamber of Commerce
- Member and Board of Directors, People Are Concerned

## References

*Available upon request*

**EXHIBIT A**

| SCHOOL DISTRICT | 2011-12 ENROLLMENT | BLACK (%) | NON-BLACK (%) |
|---|---|---|---|
| Camden Fairview | 2,425 | 1,481 (61%) | 944 (39%) |
| Harmony Grove | 1,036 | 230 (22%) | 806 (78%) |
| Smackover | 822 | 187 (28%) | 635 (77%) |
| Bearden | 572 | 234 (41%) | 338 (59%) |
| Stephens | 326 | 279 (86%) | 47 (14%) |

"Statewide Information System Reports: Enrollment." *ADE Data Center.* 8 December 2011.
Arkansas Department of Education. 12 December 2011.
<http://adedata.arkansas.gov/statewide/Districts/Enrollment.aspx>

**EXHIBIT B**

| AREA | POPULATION/ ENROLLMENT | BLACK (%) | NON-BLACK (%) |
|------|------------------------|-----------|---------------|
| Union County | 41,639* | 13,721 (33%) | 27,918(67%) |
| El Dorado S.D. | 4,581** | 2,309 (50%) | 2,272 (50%) |
| | | | |
| Columbia County | 24,552* | 9,059 (37%) | 15,493 (63%) |
| Magnolia S.D. | 2,728** | 1,460 (54%) | 1,268 (46%) |
| | | | |
| Hempstead County | 22,609* | 6,646 (29%) | 15,963 (71%) |
| Hope S.D. | 2,460** | 1,153 (47%) | 1,307 (53%) |

* "2010 Census Interactive Population Search." *United States Census 2010.* 26 May 2011.
U.S. Census Bureau. 12 December 2011.
<http://2010.census.gov/2010census/popmap/ipmtext.php?fl=05>

** "Statewide Information System Reports: Enrollment." *ADE Data Center.* 8 December 2011.
Arkansas Department of Education. 12 December 2011.
<http://adedata.arkansas.gov/statewide/Districts/Enrollment.aspx>

ROBERT A. WATSON
104 Timber Hills Drive
El Dorado, Arkansas 71730
(870) 862-4604
Email: Lvoris@esd-15.org

December 16, 2011


Allen P. Roberts
Allen P. Roberts, P.A.
325 Jefferson Street
Camden, AR 71701


Dear Mr. Roberts:

I am Bob Watson. I am responding to your request that I write a report stating my opinions and observations about the impact of the racial restriction in the Arkansas School Choice Act of 1989 on El Dorado School District and other similarly situated districts in South Arkansas. You also asked that I opine on what the effect would be on those districts of free and unrestricted school choice without the existing racial restriction. I have attached as Exhibit 1 to this letter a summary of my educational and employment history.

I have attached as Exhibit 2 to this letter is a racial/enrollment chart of our part of Union County. This chart shows El Dorado to be a fifty percent black district of some 4,581 students. It is joined by three districts — Smackover, Norphlet, and Parkers Chapel — that all have a smaller total enrollment with a smaller percentage black enrollment than El Dorado. The relative racial composition of these four school districts as depicted in Exhibit 2 has existed throughout my administration at El Dorado.

It is my opinion and observation that El Dorado School District offers educational, extracurricular, and college scholarship opportunities to its students that are substantially superior to those offered by its neighboring three school districts. I respectfully submit that this conclusion is

supported by every objective standard by which one could test such a conclusion. I am also attaching as Exhibit 3 to this letter an itemization of El Dorado's academic, extracurricular, and scholarship offerings that support the conclusion of excellence that I have just advanced.

Even a cursory examination of this exhibit also clearly establishes that I would be incorrect if I advanced this bold assertion as the product of my administrative abilities. It is not, and I am just the person lucky enough to have been on board when the corporate citizens and patrons of this district, together with the people employed by the district, past, present, and future, pushed this district to the position of excellence it now enjoys.

I am have been superintendent of schools for the El Dorado School District since 1985. Before that I was the principal of El Dorado High School and also taught and held other administrative positions in the district. During that period of time, I have dealt personally with requests from parents residing in El Dorado to permit their children to attend school in another district. These requests include requests for transfers under the Arkansas School Choice Act of 1989, as well as arguments to me as to why El Dorado should permit a white student to move to another district even though that movement would not be permissible under our existing school choice statute. El Dorado is now, and throughout this period of time has been, under a desegregation court order. In that regard, I have been since 1985 the primary spokesman for the district in all its dealings with the Court and with the plaintiff-class of black students and parents, as well as with their attorney, John W. Walker.

Based on my experience referred to above, I have formed opinions and made observations regarding what you asked about. My first observation is that race trumps all other considerations, including quality of education, in Union County among most white parents selecting a school district for their child to attend. As a general rule, white parents will go to great lengths and expend great amounts of energy to send their child to the school with the smallest percentage black enrollment.

This is true now and has been true throughout my twenty-seven years as superintendent. If the School Choice Act of 1989 had not included its racial restriction, it is my opinion that El Dorado would have very quickly lost its white students and become an overwhelmingly black school district. Furthermore, it is my opinion that El Dorado could not hold its white students today were it not for the residence and racial restrictions in Arkansas' attendance laws. But for those restrictions, I believe white students in El Dorado would very quickly move to Parkers Chapel, Smackover, and Norphlet.

Finally, it is my opinion that the same situation I have described exists today in every area of Arkansas that has (1) a substantial black population; (2) and multiple school districts; (3) that are in close proximity to one another; (4) and that are racially identifiable. In other words, this is the same situation that exists all over South Arkansas. It is my belief that removal of the residence and racial restrictions from Arkansas' school attendance laws would rapidly result in segregated public education in South Arkansas very similar, if not identical, to what existed through the 1960s.

Sincerely,

/s/ *Robert A. Watson*

Robert A. Watson

ROBERT A. WATSON
104 Timber Hills Drive
El Dorado, Arkansas 71730
(870) 862-4604
Email: Lvoris@esd-15.org

Education:

Administrator Certification, University of Arkansas, Fayetteville, Arkansas (1982)
M.A., Louisiana Tech University, Ruston, Louisiana (1969, Speech)
B.A., Louisiana Tech University, Ruston, Louisiana (1968, Speech Education)
Diploma, Logan High School, Logan, West Virginia (1963)

Professional Experience:

Superintendent of Schools, El Dorado School District (1985-Present)

Principal, El Dorado High School, El Dorado School District (1980-1985)

Principal, Barton Junior High School, El Dorado School District (1975-1980)

Assistant Principal, El Dorado High School, El Dorado School District (1974-1975)

Dean of Students, Man High School, Logan County School District, Logan, West
Virginia (1973-1974)

Classroom teacher and coach, Man High School, Logan, West Virginia (1971-1973)

Classroom teacher, Man High School, Logan, West Virginia (1969-1973)

Professional Organizations and Accomplishments

Member and President (1999-2001) Arkansas Association of School Administrators

Arkansas Superintendent of the Year, 2001

Member and President (1998-2001) of Economics Arkansas, current board member

Member of the State and Public School Life and Health Insurance Board (2007-2011)

Community Activities and Honors

Member and Board of Directors (2007-2009), El Dorado Chamber of Commerce

Member and Past President (1986-1987), Rotary Club

Paul Harris Fellow – The Rotary Foundation of Rotary International

References

*Available upon request.*

**EXHIBIT 2**

| School District | 2011-2012 Enrollment | Black | Non-black |
|---|---|---|---|
| El Dorado | 4,581 | 2,309 (50.4%) | 2,272 (49.6%) |
| Smackover | 822 | 187 (22.7%) | 635 (77.3%) |
| Parkers Chapel | 650 | 67 (10.3%) | 583 (89.7%) |
| Norphlet | 414 | 93 (22.5%) | 321 (77.5%) |

"Statewide Information System Reports: Enrollment." *ADE Data Center.* 8 December 2011.
Arkansas Department of Education.  12 December 2011.
<http://adedata.arkansas.gov/statewide/Districts/Enrollment.aspx>



# El Dorado School District

200 West Oak Street
El Dorado, Arkansas 71730
870.864.5001
www.eldoradopublicschools.com
www.eldoradopromise.com

## Mission

All students in El Dorado School District will become proficient or advanced in all disciplines in a safe learning environment.

## Schools

ESD has 8 campuses with 5 elementary focus schools, 1 middle school, 1 junior high, and 1 high school.

- Hugh Goodwin Academy for the Arts (K-4)
- Northwest Environmental Studies Academy (K-4)
- Retta Brown Communication & Technology (K-4)
- Union Academy of Health & Wellness (K-6)
- Yocum Academy for Math & Science (K-4)
- Washington Middle School for Arts & Sciences (5-6)
- Barton Junior High School (7-8)
- El Dorado High School (9-12)

## Highlights & Recognitions

- Free college tuition for El Dorado High graduates
- Endowed Chairs in Math, Science, Foreign Language, and Literacy for K-12 curriculum alignment
- El Dorado High chosen in first 10 high schools to receive Arkansas Advanced Initiative for Math & Science (AAIMS) Advanced Placement grant sponsored by Exxon-Mobil
- El Dorado High "Academic Signing Day" featured in *People Magazine*
- College Board Honor Roll of Outstanding AP Programs 2010-2011
- El Dorado High state finalist for Teacher of the year featured in *Southern Living Magazine*
- Barton Junior High "Top Ten Junior High Schools Consistently High-Performing" by National Center for Educational Accountability
- El Dorado High Southern Regional Education Board (SREB) featured school in *Rigor, Relevance & Relationships Improve Achievement*
- Barton Junior High recognized as "Best Practices" high-performing middle school
- Barton Junior High recognized as Top Performing School in Literacy & Math by National Center for Educational Achievement *2009-2010 & 2010-2011*
- Jacob Javits Foundation used district as a model for statewide Gifted evaluation program
- District & staff recognized with Challenger Award by Arkansans for Gifted & Talented Education
- Magna Award from American School Boards Association 2009 & 2011

- ERI Golden Apple Award for outstanding Direct Instruction in all elementary schools
- 2010 Consolidated School *Health Healthy School Board Gold Award*
- 2010 Pride Team of the Year

## Community Support

- El Dorado Promise from Murphy Oil for 5-years of college tuition for all El Dorado high graduates
- El Dorado Education Foundation
  - Sponsor Endowed Chairs Program
  - Teacher Grants for unique projects
  - Teacher Excellence Awards
- Murphy Education Program
  - Cash Awards for student scores on Advanced Placement, ACT, SAT, & Benchmark Exams
  - Cash Awards for Advanced Placement teachers
  - Academic Letter Jackets
- Murphy Foundation has given 700 scholarships
- Union County Community Foundation annually gives over 20 scholarships to El Dorado High students
- First Financial Bank – student & teacher support
- Simmons First Bank – student & teacher support
- Share Foundation
  - Sponsor Pride Youth Program
  - Coordinated School Health

## Student Opportunities & Achievements

- 4,650 students district-wide
- Student interest focus in all elementary schools
- 19 Advanced Placement courses
  - $9,300 cash awards from AAIMS for student AP scores
  - Recognized by College Board as one of two high schools in Ark. For increased AP scores
    - 19 AP Scholars
    - 3 AP Scholars with Distinction
    - 4 AP Scholars with Honors
    - 2 National AP Scholars
- 7 Concurrent Credit courses
- Pre-AP courses in all core areas beginning 5th grade
- Gifted Program in all schools
  - Odyssey of the Mind, Quiz Bowl, unique field trips, Duke Talent Search
- Over $1.18 million dollars in academic scholarships for 2009
- Murphy Education student awards for various test scores
- ACT Support Center – free ACT preparation for all 9-12 students
- Athletic Program
  - 7-12 baseball, basketball, cross country, football, golf, soccer, swimming, tennis, track, volleyball

- ▪ AAAAAA South Athletic Conference
- ▪ Excellent athletic facilities
- ▪ State Champs 2009-10 Football & Girls Golf
- ▪ State Champs 2010-2011 Football, Girls Basketball, Golf
- ◆ Outstanding Fine Arts Programs
- ◆ Regional & State Science & Math awards
- ◆ Special Instructional Programs
  - ▪ Bridge to College Algebra, Waiting to Excel,
  - ▪ Accelerated Academies
- ◆ CHAMPS, PRIDE, FBLA, FCCLA, Young Republicans, Young Democrats, Student Counsel, and many other clubs

## Staff Highlights & Recognitions

- ◆ Over 400 certified staff
- ◆ 200 staff have advanced degrees
- ◆ 5 National Board certified teachers
- ◆ 70 Advanced Placement/Pre-AP certified staff
- ◆ 50 Laying the Foundation certified staff
- ◆ 11 GT certified staff
- ◆ Toyota Tapestry Excellence in Science Teaching Award
- ◆ National Association of Biology Teachers "Outstanding Biology Teacher of the Year"
- ◆ 1st Butler Center for Arkansas Studies Fellow
- ◆ Bessie B. Moore Excellence in Teaching Economics Award
- ◆ Robert Rauschenberg Foundation Power of Art Award
- ◆ Blue Bell Ice Cream Arkansas Regional Teacher of the Year
- ◆ 2009 Arkansas Teacher of the Year finalist
- ◆ Top Ten Finalist in Shell National Science Teacher Award
- ◆ Staff chosen for Eisenhower People to People Literacy Team for South Africa educational tour
- ◆ Arkansas Newspaper in Education Teacher of the Year
- ◆ Wal-Mart Teacher of the Year (multiple times)
- ◆ Arkansas Superintendent of the Year
- ◆ ERI Principal of the Year
- ◆ AAEA/AACIA Administrator of the Year 2010

## Fine Arts Program

- ◆ A+ School Network designation
- ◆ Music & visual arts instruction in all elementary schools
- ◆ Band grades 5-12 and Concert, Jazz, & Marching Band 9-12
- ◆ Orchestra grades 5-12
- ◆ Vocal music – various choirs, ensembles & madrigal groups 5-12
- ◆ Visual Arts
  - ◆ Watercolor, oils, ceramics

- ▪ Advanced Placement Drawing, 2-D & 3-D Art
- ▪ Artists in Education through South Arkansas Arts Center
- ▪ Master in Fine Arts instructor
- ◆ Performing Arts
  - ▪ Drama grades 5 – 12, Dance, Specialized music classes
- ◆ Thespian Troupe regularly performs at American Theater Festival in Edinburgh Fringe Festival, Edinburgh, Scotland
- ◆ Thea Foundation Scholarship students
- ◆ South Arkansas Symphony partnership
- ◆ AP Music Theory

## Technology

- ◆ 2 to 1 student to computer ratio
- ◆ All schools networked
- ◆ E-Labs, X-Labs, E.A.S.T. Lab
- ◆ Smartboards, TI Navigator, Interwrite, Quizdom, graphing calculators, Mac Labs, iPods, cameras, Compass Odyssey, A+

## Partnerships

- ◆ El Dorado Education Foundation
- ◆ A+ Schools Network
- ◆ Arkansas Council on Economics Education
- ◆ Economics Arkansas
- ◆ Boys & Girls Club
- ◆ South Arkansas Arts Center
- ◆ South Arkansas Community College
- ◆ El Dorado Chamber of Commerce
- ◆ El Dorado Education Foundation
- ◆ Healthworks Fitness Center
- ◆ South Arkansas Symphony Orchestra
- ◆ Arkansas Museum of Natural Resources
- ◆ Murphy Oil Corporation
- ◆ Murphy Foundation
- ◆ Murphy Education Program
- ◆ Cyber Innovation Center
- ◆ Share Foundation
- ◆ Simmons First Bank
- ◆ First Financial Bank

## Accreditation

ESD is fully accredited by the Arkansas Department of Education. El Dorado High is also accredited by North Central Association.

